WHITMAN, *Ex'r, Ap't, v.* MOREY *& a.*

On the question of testamentary capacity, the will itself is evidence.

On the question of undue influence, the proponent of the will may show
that nominal legacies to heirs other than children were inserted at the
suggestion of the person who wrote the will, because he erroneously
supposed it necessary to the validity of the will.

When portions of a deposition are read by one party for the purpose of
contradicting the witness who gave it, the other party may read, from
the same deposition, so much as pertains to the same subject, and
tends to explain, qualify, or limit what is so read.

The practice of, requiring an executor, upon the issues of insanity and
undue influence, to call all the subscribing witnesses to the will, if
alive, sane, and within the jurisdiction, should not be departed from
without good cause.

Whether a party shall be allowed to put leading questions to his own
witness is determined by the presiding justice while the examination
of the witness is going on before him, and is not matter of exception.

The common-law rule, forbidding a party to discredit his witness, has no application when the party, by legal intendment, has no choice, as in the case of an attesting witness.

Upon the issues of insanity and undue influence, declarations of the testator, tending to show the state of his feeling towards relatives to whom he gave only a nominal sum, may be received.

A request for instructions to the jury, which, in effect, assume as matter of law what should be left to the jury as matter of fact, is properly denied.

A request for instructions which in effect require the proponent of a will to explain why the testator made it as he did, is properly denied.

APPEAL, by the plaintiff from a decree by the judge of probate disallowing the will of Rachel Sargent, deceased.    The issues were,—(1) That the testatrix was not of sound and disposing mind; (2) that she was induced to execute the instrument by undue influence on the part of the plaintiff, of his wife, Mary W. Whitman, and of others, interested in the making of the same; (3) that it was not signed and sealed by her, or by any person in her presence and by her express direction.

The will was executed December 12, 1881, and the testatrix died December 15, 1881, at the age of seventy years, unmarried, and without children.    She left three sisters, and several nephews and nieces (including the plaintiff), children of two deceased brothers.    Another brother died in 1880, leaving no children. After providing for the payment of debts, funeral charges, and the erection of a monument, she gave a legacy of one dollar to each of her sisters, and to each of her nephews and nieces, except the plaintiff, who was made residuary legatee.    The estate amounted to about $3,700.    The defendants introduced evidence tending to support each of the issues, and the evidence for the plaintiff tended to sustain the will, and to explain, modify, or contradict the evidence of the defendants.

Ephraim B. Strong, the first witness to the will, was called by the plaintiff, and testified to the execution of the will and to writing it himself.    He testified that, in reply to his question as to what disposition the testatrix desired to make of her property, she said she desired to give it to the plaintiff; that he understood, in order to accomplish that purpose and have the will operate to give the property to the plaintiff, it would be necessary to name all the heirs of the testatrix with a nominal bequest to each, and he proceeded so to name them in the will without any specific direction, except that she desired to give her property to the plaintiff.    To the statement of the witness as to his understanding of the necessity of naming all the heirs, and giving to each a nominal sum, the defendants excepted.

On cross-examination of Strong, the defendants read portions of

30*

his deposition previously taken by them, claiming that such portions tended to contradict his testimony on the stand. The interrogatories and answers so read were as follows:

*Int.* 41. "Who furnished you the names of the heirs, or names of legatees, in that paper?" *Ans.* "Mr. Whitman. I asked him for it. C. F. Whitman." *Int.* 42. "Did Mrs. Sargent suggest any of those names to you, or give any of them?" *Ans.* "I don't think she did. When I read that part of the will, she said that was as she wanted it." *Int.* 77. "Why did n't you change it when you found she could not sign?" *Ans.* She seemed so tired and exhausted that I thought it best to let it go as we had it." *Int.* 83. "You were mistaken about that, it seems?" *Ans.* "I was. Yes."

The court, without examining the deposition, permitted the plaintiff's counsel, on motion, to read such interrogatories and answers as related to the matters concerning which the defendants had read, but no others except at their risk. Subject to the defendants' exception, counsel read interrogatories and answers from 6 to 107 inclusive.

The plaintiff called two of the witnesses to the will, Strong and Russell, both of whom sustained it. He then stated that the third witness, Tillotson, was hostile to the will, and proposed to read the will to the jury. The court, not understanding that Tillotson was within the state, permitted the will to be read to the jury, and the defendants excepted. Immediately thereafter, it having come to the knowledge of the court that Tillotson was in attendance, the plaintiff was directed to call him and examine him as to the execution of the will and the capacity of the testatrix, which was done subject to the plaintiff's exception.

It appearing to the court that Tillotson was hostile to the plaintiff and to the will, the plaintiff's counsel were permitted to examine him the same as if he had been called by the other side, and to contradict his testimony against the objection of the defendants. Among other things, the witness was inquired of whether he had not stated to persons differently from what he had testified on the stand, and especially whether he had not stated to Mrs. Pierce that the mind of the testatrix was bright and clear to the last; whether he did not state to Dr. Blair that the testatrix had made a will and given her property to the plaintiff, and that it was all right; and whether he had not told one Russell that at the time the testatrix revoked a certain power of attorney, the plaintiff made an explanation which was satisfactory to the testatrix, and that thereupon she was satisfied that he was honest, and became reconciled to his conduct in the matter, and so expressed herself. The witness denied making any of these statements, and was contradicted by Mrs. Pierce, Dr. Blair, and Russell; to all of which the defendants excepted.

The title of the farm on which the testatrix lived was formerly in David Whitman, and at one time after his death it was in doubt

whether he had conveyed to Samuel Whitman (under whom the testatrix claimed under a bond upon which she had paid some $900), and if so, whether the deed had not been lost and not recorded. The testatrix was informed that the plaintiff claimed the farm as belonging to the estate of his father, David, and thereby became offended with him. It appeared in the plaintiff's examination of Tillotson that she employed him to examine the records, and that he found the deed from David to Samuel was recorded; that the register gave him a memorandum on the back of an envelope of the volume and page of the record, which was shown by him to the testatrix, and that thereupon they had some conversation in relation to the matter. On cross-examination of Tillotson by the defendants they offered the memorandum in evidence, but the court excluded it as immaterial, it not being explanatory of the conversation, and there being no controversy as to the fact of such a conveyance.

On the plaintiff's direct examination, he stated that the place on which the testatrix lived and died was the one conveyed by David to Samuel; and the defendants excepted on the ground that the deed described the land, and was the best evidence of what it conveyed.

The defendants put in evidence tending to show that the testatrix said, in speaking of the plaintiff, "You don't know him as well as I do. He stole oats from Samuel's field, and Samuel caught him and threatened to flog him; and I told Samuel to let him go and serve his time out, and then get rid of him, and that the whole world could not make me believe he was honest." Subject to the defendants' exception, the plaintiff testified that he never stole any oats from Samuel, and that he never heard of it until it was testified to on the stand.

The defendants also introduced evidence tending to show that the testatrix said, in September or October, 1881, that the plaintiff had neglected her in the management of her farm affairs; that she, among other things, complained that he had not properly cared for the crops, either in harvesting or afterwards; and that he had abused and cruelly treated a Mitchell boy who was living with him. All of this was denied by the plaintiff, subject to exception.

Also subject to exception, the plaintiff was permitted to state the sources from which the testatrix's estate came, namely, $1,800 as heir of Samuel, $1,560 for services rendered Samuel, and about $400 of her own. The ground of exception was, that the probate records were the best evidence. The plaintiff was administrator of Samuel's estate, and testified from his knowledge.

Mrs. Morey, sister of the testatrix, lived with and was supported by her two sons. Mrs. Pierce, a witness for the plaintiff, and who had lived with the testatrix, was inquired of respecting the feelings of the testatrix as to the Morey family, and replied, subject to exception, that she had always heard her speak unfavorably of

the boys on account of their drinking habits, but on cross-examination she testified that she had never heard her speak unkindly of Mrs. Morey. Subject to a like exception, the witness was asked by his counsel what the feelings of the testatrix were towards the plaintiff, and what she had heard her say about him. She answered, subject to exception, that the testatrix was favorably inclined to the plaintiff, but could not state the precise language she had heard her use in regard to him, but from the impression she got from what the testatrix said, she inferred that the plaintiff was her favorite, and would get her property.

Mrs. Tillotson, a witness for the defendants, stated on her redirect examination that the plaintiff's wife told her that the Morey boys were drinking people. Thereupon, on the re-cross-examination, she was asked if she had not heard the same thing from other sources before Mrs. Whitman told it to her, and answered that she had. To the question and answer the defendants excepted.

The defendants offered to show by the same witness that Mrs. Whitman was a drinking woman. The offer was excluded, and the defendants excepted.

Some evidence having been put in by the defendants tending to show that the plaintiff's wife was a drinking woman, the plaintiff, in rebuttal, and subject to exception, was permitted to deny the charge, and to state that he had had but two quarts of liquor in fourteen years in his family, and that that was for sickness.

On the issue of undue influence, the defendants requested the court to charge the jury as follows:

"1. That the influence must be strong enough to control free agency to avoid a will; consequently much depends' on the strength of mind of the person making the will.

"2. That when it appears that the efforts to procure a will were made by interested parties, or those who acted in their behalf, and the will seems to have been the result of such efforts, and is unreasonable and unjust in its provisions, it is natural and right to conclude that the influence did destroy free agency, or it would not have produced such results.

"3. That where a will is unreasonable in its provisions, and inconsistent with the duties of the testator with reference to his family and property, this will impose upon those claiming under it the necessity of giving some reasonable explanation of why it is made so." The court declined to give the instructions requested, and the defendants excepted.

On the issue of undue influence the following instructions were given the jury:

"If you find that Mrs. Sargent was sane, then you will have to go one step further and pass upon the second issue, which is substantially whether she was induced to make the will by undue influence on the part of the Whitmans, or either of them, or on the part of others interested in the making of the will. What, then,

is undue influence? For present purposes I think a fair general definition is this: Whatever destroys free agency, and constrains a person to do what is against his will, and what he would not do if left to himself, is undue influence, whether the control be exercised by physical force, threats, importunity, or any other species of mental or physical coercion.

" What, then, is undue influence which will avoid a will? It is the use of such appliances and influences as take away the free will of the testator, and substitute another's will for his, so that in fact the instrument is not the expression of the wishes of the testator in the disposition of the property, but of the wishes of another. But where no fraud or deception is practised, mere persuasion will not invalidate a will on the ground of undue influence. On the contrary, a testator may properly receive the advice, opinions, and arguments of others, and if, after all such advice, opinions, and arguments, the testator is not controlled by them to the extent of surrendering his free agency and yielding his own judgment or will, then there is no such undue influence as is required to be proved to avoid the will. To vitiate or render void a will by reason of undue influence, the influence must amount to force and coercion, destroying free agency, and not merely the influence of affection, or merely the desire of gratifying another; but it must appear that the will was obtained by this coercion,—by importunity that could not be resisted; that it was made merely for the sake of peace, so that the motive was equivalent to force and fear. If, therefore, you find that Mrs. Sargent was induced to make this will by such an influence, that is, by an influence amounting to force and coercion and destroying her free agency, you will, on this issue, find that she was induced to make the will by undue influence; but if you find that the will was not obtained by such an influence, you will answer the second question *No.* And in arriving at a conclusion on this issue, you will of course bear in mind the state and condition of Mrs. Sargent at the time of the making of the will, because it is obvious that one sick in body or enfeebled in mind may be coerced by an influence that would be insufficient to take away the exercise of free agency in another strong of body and in mind. And as bearing upon the issue, you may also properly consider the situation and circumstances surrounding Mrs. Sargent and the Whitmans and her other relatives at the time of the making of the will, and the evidence as to the relations existing between them and the testatrix before it was made, and also the acts of the Whitmans, or either of them, in its procurement and the reasonableness of its provisions.

" You will first determine whether the Whitmans induced Mrs. Sargent to make the will. If they did not, of course you need go no further on this point. If they did, then the material question is, whether they used unlawful means. As has been before stated, it is not unlawful for a person to give advice to a testator in regard

to the making of a will, or as to the disposition of his estate, or to use arguments or persuasions as to the proper object of his bounty; and so, too, attention and kindness are also legitimate means which may be employed by a person in procuring a will to be made in his favor. But he must not resort to importunity that the testator, from his enfeebled condition, cannot resist, or to any other means which amount to coercion, and which destroy his free agency.

"If, upon the evidence, the probabilities, and all the circumstances of the case, you find that the Whitmans procured the will to be made, then, in order to say that Mrs. Sargent was unduly influenced by them, you must find that they used improper means of the kind I have indicated, and which took away her free will. You will say how this was, and by your verdict answer accordingly."

The trial occupied some nine days. At the close of the charge upon the issues, the court referred to the length of the trial, and said to the jury, that, in contemplation of the law, a verdict ought to be returned by juries in all cases submitted to them, and that by the oath they had taken they were bound to return a verdict in this case, if they could do so without violating their honest convictions. The instructions in *Ahearn* v. *Mann*, 60 N. H. 473, 474, were then given, and the defendants excepted.

The jury returned a verdict for the plaintiff upon all the issues, which the defendants moved to set aside.

*Aldrich & Remich* and *Chapman & Lang*, for the defendants.

*Bingham, Mitchells & Batchellor* and *Drew, Jordan & Carpenter*, for the plaintiff.

SMITH, J. 1. The remark of Strong, in his testimony, that "he understood, in order to have the will operate to give the property to the plaintiff, it would be necessary to name all the heirs of the testatrix," was competent evidence to show how the nominal legacies of one dollar got into the will. The will itself is competent evidence on the question of sanity. The evidence objected to was competent for either party. It tended to show that the nominal legacies were not inserted by Strong by direction of the testatrix.

2. Strong, a subscribing witness to the will, and the person who wrote it, was called by the plaintiff, and testified to the execution of the will, and to the circumstances attending its execution. For the purpose of contradicting him, the defendants read detached portions of his deposition, previously taken by them. This gave the plaintiff the right to read to the jury so much of the deposition as pertained to the same subjects, and tended to qualify, limit, or explain the answers read by the defendants. *Wentworth* v. *McDuffie*, 48 N. H. 402, 404; *Prince* v. *Samo*, 7 Ad. & E. 627; 1 Gr. Ev., s. 46. A party calling a witness may reëxamine him so far as to explain the sense and meaning of expressions used by him

in a former statement as to which he has been cross-examined, and may inquire as to the motive by which he was induced to use such expressions. The evidence is admitted to render that introduced by the other side intelligible, and to prevent a party from being prejudiced by an extract which would be misunderstood unless the context were supplied. *The Queen's Case,* 2 Brod. & Bing. 284, 298; *Randle* v. *Blackburn,* 5 Taunt. 245; *Thompson* v. *Austen,* 2 D. & Ry. 358; *Smith* v. *Blandy,* Ry. & M. 257; *Darby* v. *Ouseley,* 2 Jur., N. S. 497; *Way* v. *Butterworth,* 106 Mass. 75; *Wentworth* v. *McDuffie, supra; Ward* v. *Dow,* 44 N. H. 45; 1 Gr. Ev., *ss.* 201, 467; Chamberlayne's Best on Ev., *s.* 520. The defendants object that the plaintiff read more of the deposition than he was entitled to read under the settled rules of evidence. The detached portions read by the defendants related to the physical and mental condition of the testatrix, and the source from which Strong obtained the names of the nominal legatees. They bore upon each of the issues,—mental capacity to make a will, undue influence, and the due execution of the will. The defendants undertook to prove that the plaintiff furnished Strong with the names of the nominal legatees, as tending to show that he dictated the will. This made it competent for the plaintiff to show everything he said to Strong on that subject, for the purpose of proving that he did not dictate the terms of the will; and it was competent for him to show that he, at the time, disavowed any knowledge of the intentions of the testatrix. It was also competent for him to show what he did say to Strong, as bearing on the question of undue influence. One of the answers read by the defendants related to the physical condition of the testatrix. Her mental condition might be affected by her physical condition: all of the deposition upon that subject was therefore competent. It does not change the result that the defendants used portions of the deposition to contradict Strong, and not as substantive testimony. The answers read by the defendants related to one conversation between Strong and the plaintiff; and the general rule applies, that all of the conversation on the same subjects is admissible.

If more of the deposition was read than was necessary to explain the portions read by the defendants, it related to immaterial matters, and as it does not appear that the trial was affected thereby, no reason is furnished for disturbing the verdict.

3. The third issue was, whether the will was signed and sealed by the deceased. Whether the executor is or is not bound by a general and inflexible rule of law to call the subscribing witnesses on issues of insanity and undue influence (*Perkins* v. *Perkins,* 39 N. H. 163, 167, *Boardman* v. *Woodman,* 47 N. H. 120, 132, 140, 141, *Hardy* v. *Merrill,* 56 N. H. 227, 233), the usage of requiring him to call them before reading the will is a practice which there is no occasion to discontinue, and should not be departed from without good reason. The plaintiff was required to call two before

'he read the will to the jury, and was not at that time required to call the third, because the court understood the third was not within reach of process, and could not be produced. As soon as the will was read, the third, being present, was called by the plaintiff. It does not appear that the time of his giving his testimony was prejudicial to the defendants.

4. Whether a party calling a witness whom he finds hostile shall have leave to put leading questions in the nature of cross-examination, is a matter within the discretion of the court at the trial. *Wells* v. *Iron Co.*, 48 N. H. 491, 540. From the decision of the presiding judge, unless the question of discretion is reserved there is no appeal. *Bundy* v. *Hyde*, 50 N. H. 116, 120. A party may prove the previous contradictory declarations of a witness whom he has called to the stand, when it is established that he was surprised at his testimony, and was not guilty of collusion or bad faith, and that the witness was adverse to him. *Hurlburt* v. *Bellows*, 50 N. H. 105, 116. The common-law rule, forbidding a party to discredit his witness, has no application when the party by legal intendment has no choice, as in the case of an attesting witness. Chamberlayne's Best on Ev., s. 644, n. 3, and authorities cited. The testimony of Mrs. Pierce, Dr. Blair, and Mr. Russell was not inadmissible.

5. We discover no error in the rejection of the memorandum of the volume and page in which the deed from David Whitman to Samuel Whitman was recorded, there being no controversy as to the fact of such conveyance, and no dispute that Tillotson had the conversation with the testatrix which he testified to, or that he exhibited the memorandum to her.

6. Evidence that the place on which the testatrix lived was the one conveyed by David to Samuel was competent for the purpose of identification. *Non constant* that she lived there at the time of the conveyance.

7. Evidence that the plaintiff never stole oats from Samuel Whitman was competent as tending to show that the testatrix never made the remark attributed to her in regard to the oats. If the jury should be satisfied that the alleged larceny was never committed, they might disbelieve the testimony of the defendants' witnesses that the testatrix made such a statement. For the same reason, evidence that the plaintiff did not neglect the management of her farm affairs, and that he did not abuse the Mitchell boy, was competent.

8. As the plaintiff testified from his knowledge as to the sources from which the estate of the testatrix came, the evidence is not open to the objection that the best evidence was not produced. The evidence was not in regard to what estate she inherited from Samuel, but that his estate was the source from which some of her estate came.

9. The evidence of Mrs. Pierce respecting the intemperate hab-

its of Mrs. Morey's sons, nephews of the testatrix, was competent as tending to show her feelings towards them, and as an explanation or reason why she left them nominal legacies. It was evidence tending to show that the provisions of the will were in accordance with the intention of the testatrix, and not the result of undue influence.

10. The testimony of Mrs. Pierce, that the testatrix was favorably inclined to the plaintiff. might be the statement of a fact. She was asked what she heard the testatrix say about the plaintiff. The witness, being unable to recall the language used, might state the substance of it as it was impressed on her memory. "An impression of a past fact," said *Sawyer*, J., in *State* v. *Flanders*, 38 N. H. 324, 332, " may mean personal knowledge of the fact as it rests in the memory, though the remembrance is so faint that it cannot be characterized as an undoubting recollection, and is therefore spoken of as an impression. This perhaps is the sense in which the word is most commonly used by witnesses in giving their testimony. In this sense the impression of a witness is evidence, however indistinct and unreliable the recollection may be. No line can be drawn for the exclusion of any record left upon the memory, as the impress of personal knowledge, because of the dimness of the inscription.  *  *  *  An impression, however, may. mean an understanding or belief of the fact, derived from some other source than personal observation, as the information of others; or it may mean an inference or conclusion of the mind as to the existence of the fact, drawn from a knowledge of other facts. When used in these senses, it is not evidence." The witness (Mrs. Pierce) did not state the language used by the testatrix, and the question is whether she stated her impression of the substance of what was said as it remained in her memory, or the inference she drew from what was said. Strictly interpreted, the answer of the witness might be her inference from what the testatrix said, which might be incompetent. *Hoitt* v. *Moulton*, 21 N. H. 586, 588; *State* v. *Flanders, supra; Kingsbury* v. *Moses*, 45 N. H. 222, 225. But the testimony is capable of another interpretation. The meaning of the witness might be that she gave the substance of what the testatrix said as it lay in the memory. A witness's meaning is often a question of fact properly determined at the trial, where some light may be derived from his appearance and manner of testifying. Many such questions are necessarily passed upon by the court or the jury at the trial, and are so far questions of fact that they cannot be considered at the law term. In this case the admission or rejection of the evidence would not be error of law.

11. If Mrs. Tillotson's testimony, that the plaintiff's wife told her that the Morey boys were drinking people, was competent evidence on the issue of undue influence, it was competent for the plaintiff to rebut that inference by. showing that the subject of their intemperate habits was common talk.

12, 13. The evidence introduced by both parties on the immaterial question of the drinking habits of the plaintiff's wife, is no cause for a new trial.

14. The first instruction requested was in effect and substance included in those given. The second instruction requested assumes as matter of law what should be left to the jury to find as matter of fact. The request was properly denied, as also was the third. The question whether or not a will is entitled to probate does not depend upon the ability of its proponents to explain why the testator made it as he did. The statutory right of every person to dispose of his estate by will does not depend upon the condition that its provisions shall be reasonable, or consistent with his duties to his family. If they are unreasonable, or inconsistent with his duties to his family, that fact may have weight in determining the issues of sanity and undue influence, but it is not the test for admitting the will to probate; nor will the failure of the proponents to explain the motives of the testator lead to the setting aside of the will. The instruction requested is equivalent to the proposition that unless the provisions of a will are reasonable, or if unreasonable unless the proponents present a reasonable explanation of its unreasonable provisions, it cannot be admitted to probate. Such is not the law. *Lord* v. *Lord*, 58 N. H. 7, 11.

15. No reason is suggested why the instructions given in *Ahearn* v. *Mann*, 60 N. H. 473, as to the importance and duty of the jury's agreeing, were not proper on this occasion.

The exceptions are overruled, and the

*Decree of the probate court reversed.*

BLODGETT and BINGHAM, JJ., did not sit: the others concurred.