Rockingham, ⎱
Feb. 1, 1927. ⎰

## STATE *v.* THOMAS M. MANNION, JR.

Whether photographs are admissible does not depend upon whether the objects portrayed could be described by the photographer in words, but whether in the judgment of the trial court he can make his description clearer and more helpful by such pictures.

The questions whether photographs should be excluded as tending to excite passion and prejudice, and whether sufficiently identified as a correct representation of the subject, are for the trial court.

A question propounded by the court to a witness is not objectionable as assuming matters not in evidence where the court did not attempt to repeat the previous evidence with exactness but only endeavored to direct the witness' attention thereto.

Testimony that a person "looked very downcast; I thought he must be out of work" is unobjectionable.

The extent to which cross-examination may be carried is for the presiding justice.

A statement by the trial court to the effect that the evidence of a city marshal on cross-examination did not tend to show bad faith was not error where the evidence was merely indicative of his interest in the cause of the state and the statement accompanied a ruling excluding further cross-examination on that ground.

A general exception to granting to a party the privilege of cross-examining his own witness on the ground of surprise presents no question of law. Cross-examination as to supposed discrepancies between the testimony at the trial and a stenographic report of his previous statement shown to the witness at the trial is not objectionable on the ground that such report had not been regularly introduced in evidence.

A question to a witness by the presiding justice is not exceptionable on the ground that the manner of the justice disclosed he did not believe the witness, where the jury were subsequently directed to disregard any supposed views of the justice and told that the witness had not made any inconsistent statements.

The opinions of a chemist and of a pathologist that a person's neck had been cut by a razor "from the left to the right" were properly admitted where the trial

court found that they were in possession of sufficient data on which to base
their opinions and that such evidence would aid the jury.

A respondent's offer to testify is a waiver of his privilege in its entirety, and as
to all relevant facts.

A letter by a wife to her husband who is subsequently indicted for her murder
and containing a charge of jealousy is admissible on the issue of motive.

Whether a letter written to a respondent who denies having received it is suf-
ficiently authenticated to be admitted is a question for the trial court.

Upon the admission of evidence offered in rebuttal, the trial court may rule
that such evidence is also admissible for any relevant bearing it may have
on the case.

An erroneous definition of the rule of reasonable doubt given by counsel for the
state *arguendo* will not vitiate a verdict unless endorsed by the court.

The court is not obliged to make use of the specific language of a request if the
respondent's rights are protected by a proper instruction upon the subject
of the request.

An instruction that the jury were not to decide a contest but to ascertain the
truth is proper, and the further instruction that the jury were to decide
whether the laws "shall become a dead letter" was not prejudicial in view
of a further instruction that "a proper enforcement of the law demands an
acquittal of the innocent just as imperatively as it demands the conviction
of the guilty — perhaps more so."

An instruction that "the respondent here has the vital and obvious interest
which any man charged with crime of this kind must have to escape a con-
viction" was unobjectionable when a previous instruction had adequately
stated that the testimony of any witness was subject to be discounted on the
ground of his interest.

If a charge states correctly the law of malice aforethought and gives illustrations
thereof so that on the whole the charge is sufficiently favorable to the re-
spondent, no error exists.

INDICTMENT, for murder. Trial by jury and verdict of guilty.

The state's evidence tended to prove that the defendant on April
24, 1925, at a point on Little Harbor road, so-called, in Portsmouth,
killed his wife by cutting her throat with a razor. The defendant
claimed that his wife committed suicide. Further facts are stated
in the opinion.

Various exceptions were taken to the admission of evidence, to
the refusal of the court to grant certain requests for instructions,
to the charge, and to the attorney-general's argument. Transferred
by *Branch*, C. J.

*Jeremy R. Waldron*, attorney-general, and *Stewart E. Rowe*,
solicitor (*Mr. Waldron* orally), for the state.

*Irving A. Hinkley, John L. Mitchell* and *Joseph D. Sullivan* (*Mr.
Hinkley* orally), for the defendant.

MARBLE, J. 1. Immediately after the commission of the alleged crime and before. Mrs. Mannion's body had been removed, certain photographs were taken showing the body as it lay in the road. These photographs were offered through a witness who testified that his occupation was that of a photographer, that he had been called to Little Harbor road on April 24, and that he had there "photographed Mrs. Mannion." The defendant objected to the admission of the photographs because the rule governing their admission had not been complied with, because they had no tendency to convey to the jury anything that could not be adequately conveyed by words, and because they were calculated to appeal to passion and prejudice. Subject to his exception, they were marked as exhibits and admitted in evidence, after which they were fully explained by the witness and then examined by the jury.

The witness was clearly qualified to stand as "testimonial sponsor" for the exhibits in question. He must have observed the body in order to photograph it, and the fact that he was a photographer by occupation was at least *prima facie* evidence that the photographs were properly taken. His affirmation that they represented what he had observed could be "implied from his very oath." 2 Wig. Ev., s. 793, citing State v. Fox, 25 N. J. Law 566, 602. Moreover, the photographs were fully verified before the jury saw them. Their admissibility did not depend upon whether the objects they portrayed could be described in words but on whether it would be useful to permit the witness to make his description clearer in that way. 2 Wig. Ev., s. 789. The determination of this question as well as of that relating to the claim that they were calculated to excite passion and prejudice was for the trial court. State v. Hause, ante, 133, 135, 136, and cases cited.

The same rule applies to the admissibility of a photograph taken later at the rooms of an undertaker. Whether this photograph was sufficiently identified as a correct representation of the subject was a matter to be decided by the presiding justice. Pritchard v. Austin, 69 N. H. 367; Parker v. New Boston, 79 N. H. 54; Cross v. Company, 79 N. H. 116, 120.

2. A witness called by the state testified that she had met the defendant and his wife on Little Harbor road on the afternoon of April 24. To the question, "Did you take much notice of those people as you met them there?" she answered: "Yes, I did." And on being asked the reason, replied: "Why, the first thought that came into my mind was it was afternoon and I wondered why the

man was n't working, and then I looked at his face and he looked
so —"

At this point counsel for the defendant interposed an objection
and the sentence was not finished. After counsel had completed the
examination of the witness, the court said to her: "You started
to say that you took particular notice of the man because of some-
thing, some appearance of his face. Now what did you start to say?"
Subject to the defendant's exception, the witness answered: "He
looked very downcast; I thought he must be out of work."

The defendant's motion to strike the answer from the record was
denied, and the defendant excepted.

The contention that the question assumed matters that were not
in evidence is untenable. Obviously, the court did not attempt to
repeat the statement of the witness with exactness, but merely
endeavored to call her attention to a particular point in the direct
examination that she might finish what she had been about to say.
See *State* v. *Hause*, *ante*, 133, 137. Her description of the defendant's
appearance was unobjectionable. *Simoneau* v. *Railway*, 78 N. H.
363, 364, and cases cited; 4 Wig. Ev., *s.* 1974, and cases collected
in the note.

3. The first investigation of Mrs. Mannion's death was conducted
by the city marshal of Portsmouth, who secured the services of the
medical referee, made arrangements for taking photographs, in-
spected the locality, and talked with witnesses, including the de-
fendant. He stated on cross-examination that he had testified at
the preliminary hearing in the municipal court and while he had
answered fully and truthfully the questions which the defendant's
counsel had asked him, he had not volunteered all the information
he then possessed. After he had been interrogated at length regard-
ing specific matters which he had not seen fit to disclose at that
time, the court asked the purpose of the examination. Counsel for
the defendant claimed that it showed lack of good faith, where-
upon the presiding justice stated that it showed nothing of the kind
and said he thought the attorneys for the state ought to object to
objectionable evidence. He then instructed counsel to "discontinue
that line of inquiry." To this ruling and statement of the court the
defendant excepted.

Bad faith implies an improper motive. The city marshal was a
public officer charged with the duty of enforcing the law. He was
under no obligation to assist the defendant in the preparation of his
defense. The testimony, at most, was merely indicative of interest

in the cause of the state. The court correctly ruled that it did not show a lack of good faith, and that it was objectionable when offered for that purpose.

Practically the entire cross-examination comprising over fifty questions and answers had been directed to the subject of the marshal's failure to volunteer information. He freely admitted that he had given no information except in response to counsel's inquiries. The court did not strike out this testimony as irrelevant (*Watson* v. *Twombly*, 60 N. H. 491, 493), but simply stated that it did not prove what counsel claimed. So far as it was material on any other collateral issue it stood, and the power of the court to limit cross-examination on such issues is undisputed. *Free* v. *Buckingham*, 59 N. H. 219, 226; *Baldwin* v. *Wentworth*, 67 N. H. 408; *Emerson* v. *Lebanon*, 67 N. H. 579; *Willard* v. *Sullivan*, 69 N. H. 491; *Farnham* v. *Anderson*, 75 N. H. 607; *Crawford* v. *Railroad*, 76 N. H. 29, 32; *State* v. *Fogg*, 80 N. H. 533, 534, and cases cited; *State* v. *Labombarde, ante*, 493.

4. On the evening of April 25, the defendant, who had been in hiding, gave himself up. The witness who took him to the police station, called by the state, testified that he asked if his wife was dead and explained his possession of the razor, but that he (the witness) did not remember the rest of the conversation. On the state's assertion of surprise at this statement, the court permitted the state to cross-examine the witness. The general exception to the granting of this privilege presents no question of law. *State* v. *Roach, ante*, 189, 190; *Dow* v. *Dow*, 77 N. H. 150, 151; *Whitman* v. *Morey*, 63 N. H. 448, 456; *Gerrish* v. *Gerrish*, 63 N. H. 128; *Bundy* v. *Hyde*, 50 N. H. 116, 120.

During the cross-examination which followed, the witness stated that he had returned to the police station that night after leaving the defendant there and had talked with the attorney-general and city marshal, and that a stenographer had been present. The defendant excepted to refreshing the recollection of the witness by the use of a document which purported to be a record of what the witness had said on that occasion. At the request of defendant's counsel the document was shown to the witness.

It is now urged that the witness could not be cross-examined as to any supposed discrepancies between his testimony and this document until the document had been regularly introduced in evidence. *Villineuve* v. *Railway*, 73 N. H. 250, 252.

The practice sanctioned in the *Villineuve* case has been charac-

terized as a poor one. 2 Wig. Ev. (2d ed.), *s.* 1263, *p.* 894 note. But whether good or bad, it is inapplicable here. The document comprised simply the transcribed notes of the stenographer, and was not admissible. The cross-examination had reference merely to the oral statements of the witness.

At the close of the examination the court inquired of the witness: "Now tell us, did Mannion on that night admit to you in any form of words that he killed his wife?" The defendant excepted, and the witness replied: "No, sir, I don't remember it."

In view of this response it is difficult to see how the inquiry, even if improper, could have harmed the defendant. But counsel argue that the jury must have inferred from the questions and conduct of the presiding justice that he did not believe the witness. The complete answer to this contention is found in the charge. Not only were the jurors warned not to indulge in conjecture regarding the views of the judge, who had not intended to indicate any, but were expressly instructed that they could not speculate on whether or not the witness had made inconsistent statements, since there was no evidence that he ever had. It is presumed that the jury obeyed these instructions. *Butler* v. *Webster*, 79 N. H. 125, and cases cited.

5. Two witnesses, one a chemist and the other a pathologist, expressed the opinion that the wounds on the neck of the deceased had been made with the stroke starting from the left and running to the right. It was the state's contention that Mrs. Mannion's clothing had been drawn up around her throat. There were cuts in her sweater and dress, and fibers from the sweater were found on the razor-blade. The pathologist had performed the autopsy, and the chemist had made a microscopic examination of the blood and fibers found on the razor. Obviously, they were in possession of sufficient data on which to base their opinion.

In this state the rule governing the admissibility of opinion evidence "has been so broadly phrased as to eliminate much risk of technical use." 4 Wig. Ev., *s.* 1924. Such evidence is received whenever the trial court finds that it will be helpful to the jury. *State* v. *Labombarde, ante,* 493; *State* v. *Hause, ante,* 133, 136; *Kelsea* v. *Stratford,* 80 N. H. 148, 152; *Gardner* v. *Company,* 79 N. H. 452, 454; *Paquette* v. *Company,* 79 N. H. 288, 290; *State* v. *Killeen,* 79 N. H. 201, 202, and cases cited.

6. The defendant testified that his wife took the razor from his pocket and cut her own throat in his presence, and that he ran away because he feared he might be blamed. He was cross-examined

with reference to his conduct at the police station. Subject to exception, this question was asked: "You didn't explain anything about the situation?" It is now urged that the question was improper, since an accused person is entitled to keep silent without prejudice to his rights.

While it is true that a respondent who declines to testify is protected from adverse inferences which might otherwise be drawn from his silence, it is also true that if he once waives his privilege by taking the witness stand he waives it in its entirety and can claim no greater immunity than any other witness. *State* v. *Travis, ante,* 220; *State* v. *Fogg,* 80 N. H. 533, 535, 536, and cases cited. His "voluntary offer of testimony upon any fact is a waiver as to all other relevant facts, because of the necessary connection between all." 4 Wig. Ev. (2d ed.), s. 2276 (2).

Counsel in argument have failed to distinguish between the right of the state to introduce independent evidence of the defendant's conduct and the right to cross-examine him after his election to testify.

7. The defendant was shown a letter purporting to be written to him by his wife and indicating that she was about to leave him. He admitted that it was in his wife's handwriting but declared he had never received it. He had already testified that the only letter he had ever had from his wife at the time she left him might still be in his trunk. In rebuttal, the state introduced testimony to the effect that this particular letter had been found there.

The defendant excepted to the admission of the letter for any purpose, claiming that there was nothing in the case that it tended to refute, and that it had not been properly identified. After its admission, he moved that the jury be instructed not to consider its contents but to limit its use to rebuttal of his testimony. The motion was denied and the defendant excepted. In passing upon the motion the court ruled that the letter was proper rebuttal, and could be used for any relevant bearing it had on the case.

Whether it was sufficiently authenticated to be admisible at all was a question for the trial court. *Richardson* v. *Railroad,* 80 N. H. 370, 372. The fact that it contained statements identical with those which the defendant testified were in the note he admitted receiving, coupled with the fact that it had been discovered in his trunk, authorized a finding that the defendant was not telling the truth when he denied that he had ever seen the letter in question. But the letter had a further bearing on one of the main issues of the

case. It contained a charge of jealousy, and whether that charge was true or false, the letter was at least evidence from which it could be found that the defendant knew of his wife's accusation against him. It was therefore admissible on the issue of motive.

If there were no evidence to connect the letter with the note which the defendant referred to in his direct examination, it might perhaps be argued that the ruling of the court was too comprehensive and that consideration of the letter should have been confined to certain definite purposes. But the defendant in his direct examination endeavored to repeat from memory the contents of the note, and his testimony on that subject was offered and received without restriction. Having attempted to show what the note contained, he in effect introduced the note itself. *Keefe* v. *Railroad*, 78 N. H. 139, 141. The question then became merely one of identification.

When the letter was produced, the defendant repudiated it, and the state was then obliged to offer it through the testimony of the officer who had searched the defendant's trunk. The evidence was amply sufficient to justify a finding that the letter and the note were the same, and the state in introducing the letter did not profess to do more than supply a document which the defendant had incorporated without limitation or restriction into his own direct testimony.

The basis of the defendant's objection was that the letter had not been properly identified. He himself had established the terms of its admission in case it was found to be identical with the note. If, under such circumstances, he deemed special instructions necessary for his protection, he should have asked for them. *Sanborn* v. *Wilder*, 68 N. H. 471, 473; *Monteith* v. *Company, ante*, 175, 176.

8. Conceding that the attorney-general in his argument to the jury did not define with absolute accuracy the rule of reasonable doubt, the erroneous definition would not vitiate the verdict unless endorsed by the court. *Tuttle* v. *Dodge*, 80 N. H. 304, 314; *State* v. *Small*, 78 N. H. 525, 530. The correctness of the charge will be considered later.

9. The defendant requested the court to instruct the jury that if one of their number entertained a reasonable doubt of the defendant's guilt it was his duty not to vote for a verdict of guilty. There was another request to the same effect, though in different form. The presiding justice in explaining the meaning of reasonable doubt said: "If you gentlemen, *all of you*, were about to undertake some important step in your private affairs provided that this man is

guilty, and not otherwise, how would you feel about it?" He ended the charge with these words: "I hope that you will be able to reach a result which will satisfy the *consciences of you all.*"

The instructions are too long to be quoted in full, but it is sufficient to state that a careful examination of the entire charge makes it clear that no juror could possibly have failed to understand that unanimity was essential on all material issues in the case. The court was not obliged to "make use of the specific language employed by the defendant in his requests." *Graham* v. *Weber,* 79 N. H. 393, 397, and cases cited.

The court was also requested to define the rule of reasonable doubt in various forms. Several of these requests might well have been denied on the ground of obscurity. But assuming that their meaning is such as now claimed, the court did not err in denying them. The jurors were told that the respondent came before them with a presumption of innocence and that until they were satisfied beyond a reasonable doubt that he was guilty they must regard him as an innocent man. This instruction would appear to be even more favorable to the defendant than the law of this jurisdiction demands. *State* v. *Kilcoyne, ante,* 432. They were further told that "this rule which requires proof beyond a reasonable doubt obviously means that criminal cases must not be decided upon guess or conjecture or surmise, but . . . must rest on a sound and substantial basis of evidence." The meaning of reasonable doubt was then explained at length, and with correct and conventional illustrations. Since the rights of the defendant were protected by a proper statement of the rule, he cannot complain because the rule was not stated in a particular way. *Wheeler* v. *Railway,* 70 N. H. 607, 615. The presiding justice had a right to choose his own phraseology. *Romani* v. *Railroad,* 81 N. H. 206, 209; *Tucker* v. *Peaslee,* 36 N. H. 167, 178.

10. The defendant excepted to the statement of the court in the charge that there have been many cases in the past which can be explained only on the theory of "a sporting event designed to give the accused a run for his money"; that the duty of a jury today is not to decide the winner of the contest but to determine the truth, and that "members of the jury in a criminal case are at the same time members of the public for whose protection the criminal laws are passed, and it is for the jury to determine in the last instance whether those laws shall be living things and be enforced or whether they shall become a dead letter."

The instruction that the jury were not to decide a contest but to ascertain the truth was eminently proper. *Taylor* v. *Thomas*, 77 N. H. 410, 411; *Mason* v. *Railway*, 79 N. H. 300, 305. The other statements should be read in connection with the further remarks of the court that "a proper enforcement of the law demands the acquittal of the innocent just as imperatively as it demands the conviction of the guilty. Perhaps more so; for it is a well recognized maxim of our law that it is better that ten guilty men should escape than that one innocent man should be punished." When so read, the instruction complained of cannot be deemed prejudicial.

The defendant also excepted to the following instruction: "Now the respondent here has the vital and obvious interest which any man charged with a crime of this kind must have, to escape a conviction." The court had previously told the jury that they might consider the interest of the witnesses, and that it was their province as jurors to make such discount from the testimony of any interested person as they thought that interest might justify, and that the discount might "run as high as one hundred per cent," if they thought the facts required it.

It is claimed that the words excepted to, taken in connection with the above-quoted statement, must have placed the defendant in an unfair position in the eyes of the jury.

From the very nature of the trial there was a marked distinction between the position of the defendant and that of the other witnesses. His interest was self-evident and required no proof; theirs had to be inferred from individual conduct or from the facts and circumstances of the case. This was made plain by the instructions which followed. The court merely called the attention of the jury to an obvious fact. His statements were unobjectionable.

In defining malice aforethought the court said: "If a man should beat his wife with his fists, with no intention of killing her but she nevertheless does die, he is guilty of murder. The wilful doing of this injurious act of beating involves malice aforethought necessary to the crime of murder."

No claim was made at the trial that the law was not correctly stated. The exception relates to the use of the illustration "in view of the circumstances in this particular case," and it is now urged that such use was peculiarly harmful because the defendant was on trial for the murder of his wife. The illustration was but one of many. It was apt rather than inapt, and was one which is frequently

given. It is inconceivable that it could have prejudiced the defendant's rights.

It is unnecessary to consider the other exceptions, since they have been expressly waived. They appear to be without merit.

*Exceptions overruled.*

BRANCH, J., did not sit: the others concurred.